**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| LaKrystal Coats, as Personal Representative of the Estate of Demetric Cowan, </br></br>          Plaintiff, </br></br> v. </br></br> Ray Pope, in his individual capacity; FNU Nichols, in his individual capacity; FNU Cardarelli, in his individual capacity; FNU White, in his individual capacity; Gerald Brooks, in his individual capacity as Chief of Police of the City of Greenwood; Sidney Montgomery, in his individual capacity; Roy Murray, in his individual capacity; Pamela Osborne, in her individual capacity; Tony Davis, in his official capacity as Sheriff of Greenwood County, </br></br>          Defendants. | C/A #:  1:17-cv-02930-TLW-SVH </br></br></br></br></br> **DEFENDANT PAMELA OSBORNE'S REPLY TO PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |

This Reply Memorandum is filed in support of Defendant Pamela Osborne's Motion for Summary Judgment and in response to Plaintiff's Memorandum in Opposition to Summary Judgment.

### I.     FACTUAL BACKGROUND

The factual recitation by Plaintiff is not in chronological order in some respects. By Plaintiff's own admission, Defendant Osborne had no contact with the decedent until

1

approximately 3:45 a.m.[1]  Osborne was on duty in Unit 1 and took a phone call from a woman who was distraught because her husband, Mr. Terry, was in the detention center and she had not received any phone call from him.  Osborne promised her that she would have him call.  ECF 38-18 at pp. 14-15.

Osborne then returned to the main side of the detention center and went to the booking area to talk with Mr. Terry about calling his wife.  She took Mr. Terry from the holding cell to make his phone call.  While he was making the phone call, at approximately 3:45 a.m., she saw Mr. Cowan for the first time.  ECF 38 @ p. 10.  She was not aware of Mr. Cowan's presence in the detention center before that.   ECF 38-18 @ pp. 15-16.

Osborne was never made aware that Mr. Cowan had ingested cocaine.  ECF 38-18 @ pp. 83-84.  When she observed him in the cell shaking, she was informed that he was detoxing.  ECF 38-18 @ pp. 89.

Plaintiff also confuses Osborne and Montgomery in one instance in her memorandum. Plaintiff mistakenly alleges that Officer Osborne told Cowan to quit faking.  ECF 38 p. 9. However, Plaintiff also footnotes that allegation to note that Officer Osborne made a supplemental statement to SLED about Sergeant Montgomery making that statement.  Officer Osborne did not make the statement and the footnote clears up the confusion.

## II. PLAINTIFF'S RESPONSE DOES NOT ADEQUATELY ADDRESS THE LACK OF ANY PROOF OF MEDICAL CAUSATION AND INSTEAD ATTEMPTS TO BOLSTER THE RECORD WITH DOCUMENTS FOUND FROM AN APPARENT INTERNET SEARCH.

By Plaintiff's own admission, Defendant Osborne had no contact with the decedent until she was assisting Inmate Terry with his phone call at approximately 3:45 a.m.  ECF 38 @ 10.

---

[1] Daylight savings time began on this date so that the times on the body cam are off by approximately one hour.

The Plaintiff alleges that decedent demonstrated signs or signals of medical distress for the first time around 3:30 am. Plaintiff has not offered any evidence whatsoever that any medical intervention at 3:45 when Osborne first saw him, or even at 3:30, would have affected the outcome.

To the contrary, the expert report of Dr. Kim Collins shows otherwise. In that report, which was produced on November 8, 2018, she indicates that the cocaine toxicity could not be successfully treated by the time the symptoms manifested. In her affidavit attached to the co-defendant's reply memorandum, she states that:

> Most probably to a degree of reasonable medical certainty even if officers had summoned emergency assistance at or around 3:30 a.m. on the morning of March 13, 2016 when Cowan first exhibited symptoms of any type of medical issue, Mr. Cowan's death was most probably not preventable due to his having ingested cocaine as shown on the autopsy and by toxicology, which was not known by those on scene.

Plaintiff's response to the causation issue is to cite to an internet article for the proposition that "…the general prognosis of the complications of cocaine body packers is considered good following early detection, treatment, and careful monitoring of patients." The article does not define "early detection" and makes no mention of whether that is before or after the body pack ruptures. However, the article concludes that "Early intervention and detection of drug body packs in such cases *could possibly* save a life." (emphasis added). ECF 38-23 @ pp. 5-6.

First, this Defendant objects to consideration of that article because it is not admissible evidence and cannot be made admissible at trial. It is not authenticated or self-authenticating, is hearsay, and the Plaintiff has not named an expert witness who could authenticate it and

3

incorporate it in an expert opinion.[2] Fed.R.Civ.P. 56(c)(2); *see also Solt v The Boeing Company,* 2018 WL 1583977 (D.S.C. 2018) (Exhibit 1); *Hinton v. McCabe,* 2018 WL 1542238 (E.D.Va 2018) (Exhibit 2); *Perry v. Jones,* 2016 WL 2747262 (E.D.Va 2016) (Exhibit 3).  In addition, it is general in nature and not addressed to the facts before the Court. Nothing in the article makes any conclusion about whether medical intervention after a body pack has ruptured can be productive or, specifically, whether medical intervention could have prevented Mr. Cowan's death.  It in no way contradicts Dr. Kim Collins' properly expressed medical opinion.  Last, even if the article could otherwise properly be considered, it is not competent evidence because the burden of proof is not met by the authors' express conclusion that medical intervention, at some point, "could possibly save a life".

Here, the question of whether early medical intervention could have affected the outcome of cocaine ingestion resulting in fatal toxicity is a matter beyond lay knowledge.  Expert testimony is necessary to establish causation.  Plaintiff has none.  The Defendants pointed out that deficiency in the proof in the initial motions and memoranda.  In response, Plaintiff only points to an internet article that claims lives could possibly be saved.  That does not meet the Plaintiff's burden of proof.  Instead, Plaintiff must prove a significant causal link between the alleged tortious acts and the injuries suffered rather than a tenuous and hypothetical connection.

> "In addition to proving the defendant negligent, the plaintiff must also prove that the defendant's negligence was a proximate cause of the plaintiff's injury." *Carver v. Med. Soc'y of S.C.,* 286 S.C. 347, 350, 334 S.E.2d 125, 127 (Ct.App.1985). Our supreme court has articulated the burden of proof borne by plaintiffs in proving proximate cause in medical malpractice cases:

---

[2] The article is written by authors residing outside the United States without full disclosure of their credentials. There is no indication that its contents have been reviewed or embraced by the American Medical Association.

> Negligence is not actionable unless it is a proximate cause of the injury complained of, and negligence may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided. When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the **800 injury, the experts must, with reasonable certainty, state that in their professional opinion, the injuries complained of *most probably* resulted from the defendant's negligence. The reason for this rule is the highly technical nature of malpractice litigation. Since many malpractice suits involve ailments and treatments outside the realm of ordinary lay knowledge, expert testimony is generally necessary.

*Ellis v. Oliver,* 323 S.C. 121, 125, 473 S.E.2d 793, 795 (1996) (citations omitted, and emphasis added). Therefore, the expert testimony as to proximate cause must provide a significant causal link between the alleged negligence and the injuries suffered, rather than a tenuous and hypothetical connection. *Id.*

However, in determining whether particular evidence meets the "most probably" test, it is not necessary that the testifying expert actually use the words "most probably." *Baughman v. Am. Tel. & Tel.,* 306 S.C. 101, 111, 410 S.E.2d 537, 543 (1991); *see also Gamble v. Price,* 289 S.C. 538, 541, 347 S.E.2d 131, 132-33 (Ct.App.1986) (holding the exact words "most probably" need not be used by the expert). The *Baughman* court held:

> It is not sufficient for the expert to testify merely that the ailment might or could have resulted from the alleged cause. He must go further and testify that taking into consideration all the data it is his professional opinion that the result in question most probably came from the cause alleged. In determining whether particular evidence meets this test it is not necessary that the expert actually use the words "most probably." It is sufficient that the testimony is such "as to judicially impress that the opinion ... represents his professional judgment as to the most likely one among the possible causes."
>
> *Baughman,* 306 S.C. at 111, 410 S.E.2d at 543 (citations omitted).

*Martasin v. Hilton Head Health Sys.*, 364 S.C. 430, 438–39, 613 S.E.2d 795, 799–800 (Ct. App. 2005).

Further, the Plaintiff must prove causation by medical expert testimony. The issue of whether calling EMS earlier would have made a medical difference in the outcome is beyond the knowledge of the average juror. In the context of a failure to provide medical attention to an

5

inmate, the United States District Court for the Western District of North Carolina has correctly observed:

> To demonstrate this resulting injury, a deliberate indifference inmate who contends "that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994).* To withstand a motion for summary judgment, the non-moving party is required to forecast expert medical evidence in order to show proof of causation—that is, whether the alleged delay in treatment caused any injury. *See Alberson v. Norris*, 458 F.3d 762, 765-66 (8th Cir. 2006) ("Where the complaint [asserting a Section 1983 claim for inadequate medical treatment] involves treatment of a prison's sophisticated medical condition, expert testimony is required to show proof of causation."). Without expert testimony pertaining to causation, a layperson cannot determine the nature of Plaintiff's medical condition as it existed on September 19, 2015, the available treatments for it, the probable medical outcomes for each such treatment, or the detrimental effect, if any, of the alleged delay on those outcomes. An average juror has no basis in common knowledge or ordinary experience to determine whether delays in treatment or other factors caused or exacerbated the injury about which Plaintiff complains. It would be entirely speculative for a jury to decide that a delay in transporting Plaintiff for medical care earlier would have resulted in a different result.
>
> *Edwards v. Graham Cty. Jail,* No. 1:16-CV-315-FDW, 2017 WL 5894496, at *6 (W.D.N.C. Nov. 29, 2017) (Exhibit 4).

Here, the Plaintiff has not offered any competent evidence of causation. Instead, they simply offer an unsubstantiated and inadmissible internet article that wholly fails to meet the appropriate burden of proof. They have no medical expert testimony and cannot rely on this unsubstantiated inadmissible internet article as their expert witness. Without admissible proof of an essential element of every claim Plaintiff has asserted - causation - the Defendants are entitled to summary judgment as a matter of law as to all claims.

**III.  PLAINTIFF HAS NOT ADDRESSED THE MERITS OF THE INDIVIDUAL IMMUNITY UNDER THE SOUTH CAROLINA TORT CLAIMS ACT AND DEFENDANT OSBORNE IS ENTITLED TO IMMUNITY AS TO ALL STATE LAW CLAIMS.**

In Section III of her opening brief, Defendant Osborne asserted her individual immunity from suit under Section 15-78-70 of the South Carolina Tort Claims Act as to the state law claims. In response, Plaintiff asserts that there are no state law claims against the individual defendants. ECF 38 @ p. 25, (Section 7).[3] The remaining arguments regarding gross negligence and intentional infliction of emotional distress appear to be related to state law claims against the entity and not against Defendant Osborne. For that reason, Defendant Osborne does not address this further.

**IV.  PLAINTIFF'S CLAIM THAT MEDICAL INTERVENTION SHOULD HAVE BEEN SOUGHT AT BOOKING IS INCORRECT AS A MATTER OF LAW AND IS INAPPLICABLE TO OFFICER OSBORNE AS SHE DID NOT SEE COWAN UNTIL 3:45 AM, SEVERAL HOURS AFTER BOOKING.**

Plaintiff attempts to claim that Cowan should have been referred for a medical evaluation during the booking process - several hours before he exhibited any symptoms of anything. Plaintiff argues that because he had smoked marijuana and taken a small amount of ecstasy earlier in the day, he should have been referred for a medical evaluation.

To support that claim, Plaintiff has attached pages from the deposition of her jail procedures expert. ECF 38-24. Nothing in that exhibit supports a claim that Cowan exhibited a serious medical need at booking such that he should have been transported to the hospital.

---

[3] At page 25 of her memorandum, ECF 38 @ 25, Plaintiff responds to the immunity argument of co-defendants Montgomery and Murray and states that the complaint does not allege any state law causes of action against them. Plaintiff never specifically addresses Defendant Osborne's immunity argument under state law but the same immunity and lack of claims against the individual defendants applies to her as well. In any event, she is immune in her individual capacity for the alleged state law claims.

7

Further, this expert admits that he is not testifying as to medical opinions and is not qualified to do so.  ECF 38-24 @ pp. 96 - 97.

Prior to his arrival at the detention center, Plaintiff had been stopped by the Greenwood Police Department.  He was charged with various offenses, including offenses based upon his conduct in responding to the officers at the stop.  Those charges included disorderly conduct and resisting arrest.  Upon arrival at the detention center, the booking officers noted information relayed from the city police, including acting violent or escape.  Mr. Aiken seizes upon that notation to allege that Mr. Cowan should have been transported for medical attention when booked.  His analysis is flawed and not in comport with the law.

Under the clearly established law, a detainee is entitled to access to medical attention when there is objective evidence of a serious medical need.

> The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee. *Martin v. Gentile,* 849 F.2d 863, 871 (4th Cir.1988) (citing *City of Revere,* 463 U.S. at 244, 103 S.Ct. at 2983, and *Estelle,* 429 U.S. at 104–06, 97 S.Ct. at 291–92).
>
> ….
>
> The general right of pretrial detainees to receive basic medical care does not place upon jail officials the responsibility to screen every detainee for suicidal tendencies. *Danese v. Asman,* 875 F.2d 1239, 1243–44 (6th Cir.1989). There can be no claim against the officers for inadequate medical care when there exists no objective evidence that Belcher even had a serious need for such attention. *See Martin,* 849 F.2d at 871.
>
> *Belcher v. Oliver,* 898 F.2d 32, 34–35 (4th Cir. 1990).

Plaintiff has not provided any evidence of an apparent serious medical need at booking. Plaintiff's expert cannot opine on medical decision making.  He points to no evidence of an apparent and serious medical need.  There is no allegation that Cowan had any visible injuries, was choking, having trouble breathing, was bleeding or having any medical issues whatsoever.

8

He was conscious and responsive to the questions asked. The witness's conclusion that Plaintiff should have been transported to the hospital prior to booking is at best impermissible hindsight, *See, Graham v. Conner*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872 (1989) (The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, *rather than with the 20/20 vision of hindsight*.) (emphasis added), and at worst, self-serving testimony by a paid expert to attempt to establish a claim. The conclusion is contrary to the law and not relevant to the issues here.

Further, even if Cowan had been referred from booking for a medical evaluation, there is absolutely no evidence that he would have disclosed that he ingested cocaine. To the contrary, Cowan never disclosed that to anyone until around 3:30 am, when he told his cellmate who remained silent. Presumably, he did not disclose it because he did not want to be charged with the cocaine - the same reason that he ingested it in the first place. Around 3:30 am, he told his cellmate that he did not feel well and that he had swallowed a bag of cocaine. Nevertheless, he still told no one else. There is nothing in the facts that would allow a jury to conclude upon anything other than pure speculation, that Cowan would have reported to any medical provider that he had swallowed cocaine when he was not experiencing any discomfort from that - and still did not want to be charged with the cocaine.

Last, this argument is misplaced as to Officer Osborne. She was not in booking when Cowan came into the detention center. She did not see him then and had no opportunity to evaluate him or send him out to medical. Instead, she saw him for the first time at 3:45 am. While Officer Osborne disagrees that Cowan should have been sent for medical attention hours before he exhibited any symptoms of anything, the Plaintiff's argument does not apply to her.

9

## V. THERE IS NO GENUINE ISSUE OF FACT TO DEMONSTRATE A CONSTITUTIONAL VIOLATION BY DEFENDANT OSBORNE AND SHE IS ENTITLED TO QUALIFIED IMMUNITY.

Officer Osborne joins in each of the arguments made by the co-defendants in their reply memorandum, and specifically including section II of that memorandum. ECF 42 @ pp. 8 - 9. Moreover, Officer Osborne is in a different position than the other defendants. She did not see Cowan until approximately 3:45 am, long after he had been booked closer to 10 pm. She was not aware of his history, had not participated in the booking process and had not seen any change in behavior. Instead, she observed what appeared to be shaking or a seizure and inquired about what was going on with this inmate. She was informed that he was detoxing. ECF 38-@ pp. 88 - 89. She is certainly entitled to rely upon information relayed to her by another officer. She and no reason to believe that his life was in danger, that he had ingested any drug or that he needed medical attention. At that point, it was too late for medical intervention to save his life. ECF 42-2. She did not appreciate a serious medical need and had very little information available to her. Most importantly, she was not aware that Cowan had ingested cocaine or was experiencing cocaine intoxication. ECF 38-18 @ pp. 83 - 84, 87. There simply is no basis upon which a jury could determine that she was aware of a serious medical need and chose not to act.

After seeing Cowan for the first time, she returned Mr. Terry to his cell. He informed her that Cowan had vomited around the toilet and she went to clean that up. After cleaning that up, she checked back on Cowan and saw him shaking. She intervened to move him away from the wall so that he would not hurt himself by hitting the wall. She tried to communicate with him. She cleaned vomit from his face and mouth. She laid him on his side to prevent any issues that might arise if he vomited again. She continued to watch him for a brief time and noticed that she could not see his chest rise and fall. She immediately entered the cell to check on him. Upon not

finding a pulse, she summoned help and instructed that 911 be called. She was not deliberately indifferent to a known serious medical need. Instead, she was trying to determine what was going on, inquired about his condition, made sure he couldn't hurt himself and watched him. She is entitled both to summary judgment on the merits because she did not violate any constitutional right and to qualified immunity from suit.

## VII. CONCLUSION

For the reasons set out above, the Defendant Osborne is entitled to summary judgment on all claims.

MORRISON LAW FIRM, LLC

By: _s/ David L. Morrison_____
   David L. Morrison, (Fed. #3581)
   7453 Irmo Drive, Suite B
   Columbia, South Carolina 29212
   Phone: (803) 661-6285
   Fax:     (803) 661-6289
   E-mail: david@dmorrison-law.com

ATTORNEYS FOR THE DEFENDANT
PAMELA OSBORNE

Columbia, South Carolina

March 28, 2019