IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| LaKrystal Coats, *as Personal Representative of the Estate of Demetric Cowan*, | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:17-cv-02930-TLW |
| Ray Pope, *in his individual capacity*, FNU Nichols, *in his individual capacity*, FNU Cardarelli, *in his individual capacity*, FNU White, *in his individual capacity*, Gerald Brooks, *in his official capacity as Chief of Police of the City of Greenwood*, Sidney Montgomery, *in his individual capacity*, Roy Murray, *in his individual capacity*, Pamela Osborne, *in her individual capacity*, and Tony Davis, *in his official capacity as Sheriff of Greenwood County*, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER**

Plaintiff LaKrystal Coats, as personal representative of the estate of her husband, Demetric

Cowan, filed this action pursuant to 42 U.S.C. § 1983 and South Carolina state law alleging

constitutional violations and tort law causes of action arising from Cowan's arrest and subsequent

detention and death at Greenwood County Detention Center (GCDC). Coats filed this case against

the following City of Greenwood police officers in their individual capacities: Officer Ray Pope,

Sergeant Steven Nichols, Officer Daniel Cardarelli, and Officer Brandon White (collectively,

Arresting Officers). Coats also sues the following GCDC officers in their individual capacities:

Sergeant Sidney Montgomery, Officer Roy Murray, and Officer Pamela Osborne (collectively,

GCDC Officers). In addition, Coats sues Gerald Brooks in his official capacity as City of

Greenwood Chief of Police and Tony Davis in his official capacity as Sheriff of Greenwood County.

Defendants filed motions for summary judgment. ECF Nos. 32, 33, 35. Coats filed a response in opposition, ECF No. 38, and Defendants replied, ECF Nos. 42, 43, 44. This matter is now before the Court for review of the Report and Recommendation (Report) filed by United States Magistrate Judge Shiva V. Hodges, to whom this case was assigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). The Report recommends that Defendants' motions be granted. ECF No. 45. Coats filed an Objection to the Report, ECF No. 50, and the matter is now ripe for disposition.

In conducting this review, the Court applies the following standard:

> The magistrate judge makes only a recommendation to the Court, to which any party may file written objections . . . . The Court is not bound by the recommendation of the magistrate judge but, instead, retains responsibility for the final determination. The Court is required to make a de novo determination of those portions of the report or specified findings or recommendation as to which an objection is made. However, the Court is not required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the report and recommendation to which no objections are addressed. While the level of scrutiny entailed by the Court's review of the Report thus depends on whether or not objections have been filed, in either case, the Court is free, after review, to accept, reject, or modify any of the magistrate judge's findings or recommendations.

*Wallace v. Housing Auth. of the City of Columbia*, 791 F. Supp. 137, 138 (D.S.C. 1992) (citations omitted).

## I. Legal Standards

The record reflects that Cowan swallowed a bag of cocaine at some point during an arrest arising out of a traffic stop. After arriving at the detention center, Cowan perished as a result of cocaine toxicity, according to the autopsy report. Coats alleges that Arresting Officers and GCDC Officers violated Cowan's substantive due process rights by delaying or failing to provide medical

care for Cowan. ECF No. 1 at 6.

To establish a constitutional violation, Coats must show that Defendants exhibited "deliberate indifference" to Cowan's "serious medical needs." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). A claim of deliberate medical indifference requires more than a showing of mere negligence, *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976), and "more than ordinary lack of due care for the prisoner's interests or safety," *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Specifically, Plaintiff must show that Defendants were "aware of facts from which an inference could be drawn that a substantial risk of serious harm exists" and that Defendants actually drew that inference. *Farmer*, 511 U.S. at 837. "If an officer fails to act in the face of an obvious risk of which he should have known, but did not, the officer has not violated the Eighth or Fourteenth Amendments." *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001).

Deliberate indifference involves an objective and a subjective component. The objective component is met if the medical need is "sufficiently serious." *Farmer*, 511 U.S. at 834. A medical need is sufficiently serious "if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (citations omitted). Under the subjective component, the plaintiff must show that the officials had "a sufficiently culpable state of mind," which is shown if an official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Stated another way, the plaintiff must "allege facts which, if true, would show that the official … subjectively perceived facts from which to infer substantial risk to the [individual], that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). If the official recklessly disregarded a known risk, a plaintiff

need not prove that the official acted purposefully to cause harm or with knowledge that harm would result. *Scozzari v. Miedzianowski*, 597 F. App'x 845, 848 (6th Cir. 2015) (citing *Farmer*, 511 U.S. at 835).

Where "minor maladies" or "non-obvious complaints of a serious need for medical care" are involved, verifying medical evidence of the detrimental effect of delay is required to establish the subjective component of deliberate indifference. *Blackmore v. Kalamazoo Co.*, 390 F.3d 890, 898 (6th Cir. 2004). In such cases, the conduct in causing a delay creates the constitutional infirmity, and the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition. *Blackmore*, 390 F.3d at 899. The Fourth Circuit has held that where a deliberate indifference claim is predicated on a delay in medical care, a constitutional violation will be found if "'the delay results in some substantial harm to the patient,' such as 'marked' exacerbation of the prisoner's medical condition or 'frequent complaints of severe pain.'" *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (quoting *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 (4th Cir. 2008) and citing *Sharpe v. S.C. Dep't of Corr.*, 621 F. App'x 732, 734 (4th Cir. 2015)).

In another branch of deliberate indifference claims, a constitutional violation may be premised solely on the delay in providing medical care where the need for medical attention is obvious. "[A] constitutional violation arises if the injury in question is so obvious that even a layperson could easily recognize the necessity for a doctor's attention, and the resulting need for treatment was not addressed within a reasonable time frame." *Scozzari*, 597 F. App'x at 849 (citing *Blackmore*, 390 F.3d at 899–900). In such a case, the plaintiff may rely on the obviousness of a detainee's serious medical condition to support an inference of an official's deliberate indifference and satisfy the subjective component. *Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual

ways, including inference from circumstantial evidence…and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *see also Blackmore*, 390 F.3d at 899 ("When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity. In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition.")

## II. Coats' Objections as to the Fourteenth Amendment Claims Arising Out of the Traffic Stop

The Report recommends summary judgment in favor of Arresting Officers, who did not seek medical treatment for Cowan, because "[they] did not see [Cowan] ingest cocaine and had no reason to suspect [Cowan] had handled or come into contact with cocaine." Coats argues that the Magistrate Judge erred by "focusing exclusively on cocaine rather than the clear evidence that [Cowan] had ingested some form of drugs."

During Cowan's arrest, the Arresting Officers discovered marijuana, ecstasy pills, a set of scales, and cash in Cowan's possession, but no other drugs. Cowan attempted to conceal ecstasy pills under his car and told Arresting Officers that he was choking. Arresting Officers searched Cowan's mouth but found nothing to indicate that he had swallowed any drugs. The record reflects that Cowan was talking and breathing normally throughout his arrest and continued to behave normally upon arriving at the detention center. Importantly, it is undisputed that Cowan did not inform Arresting Officers that he swallowed a bag of drugs at any time. While Cowan eventually informed officers that he had used drugs earlier in the day, no case law has been presented establishing that officers must specifically ask a detainee if he swallowed drugs during an arrest or that officers must seek medical treatment for general use of "some form of drugs." Given these facts, deliberate indifference cannot be shown because there is no evidence from which a fact

finder could infer that Arresting Officers in fact knew that Cowan had swallowed a bag of cocaine or that he evidenced a need for medical attention.

Coats also objects to the Report's reliance on *Brown v. Middleton*, 362 F. App'x 340 (4th Cir. 2010). She contends that *Brown* is not dispositive since the detainee in that case, who also swallowed cocaine during arrest, "received immediate medical attention." However, as the Magistrate Judge observes, the detainee in *Brown* received medical attention as soon as he fell out of the shower in the detention center and began seizing, not upon arrest. During arrest, officers found a bag of cocaine in the detainee's mouth but there was no evidence that the bag had lost any of its contents. Prior to arriving at the detention center, the detainee repeatedly denied having ingested cocaine, declined offers for medical care, and displayed no symptoms associated with cocaine ingestion. Based on these facts, the Fourth Circuit held that there was no triable issue of fact as to whether arresting officers knew the detainee needed urgent medical attention. Similarly, in this case, Arresting Officers did not know that Cowan had swallowed a bag of cocaine based on his behavior during arrest, so no triable issue of fact exists as to whether they knew that Cowan needed urgent medical attention. Therefore, this Court agrees with the analysis in the Report and concludes that summary judgment in favor of Arresting Officers is appropriate.

### III. Coats' Objections as to the Fourteenth Amendment Claims Arising Out of Cowan's Detention at Greenwood County Detention Center

According to the Report, when Cowan was booked at the Greenwood County Detention Center around 10:07 PM, Cowan informed Sergeant Montgomery that he had consumed small amounts of marijuana and ecstasy earlier in the day. Sergeant Montgomery testified in his deposition that Cowan appeared to be under the influence of drugs and alcohol. Cowan's behavior was otherwise normal for several hours. As the Report illustrates though, at approximately 3:30 AM, Cowan's condition began to degrade:

Around 3:30 a.m., Inmate told Sergeant Montgomery Decedent had vomited. Montgomery Aff. at 3. Sergeant Montgomery instructed Officer Murray to check on Decedent and isolate him in Holding Cell Two. [Murray Dep. 13:8–11 (available at ECF No. 38-12)]. Officer Murray observed Decedent crawling on the floor of Holding Cell One, "acting strange" and shaking. Murray Aff. at 3. Officer Murray directed Decedent to stand up, and Decedent refused. Murray Dep. 13:13–17. Officer Murray opened the cell door, and Decedent began to crawl out of Holding Cell One and into Holding Cell Two with a dazed look on his face. [Murray Incident Rep., ECF No. 38-14 at 2]. Decedent told Murray he was "high" and had been using drugs all day. [ECF No. 1 at 5]. Sergeant Montgomery overheard Decedent's statement. Id. Decedent mumbled and signaled to Officer Murray he would like some water. Murray Dep. 13:24–14:2. Officer Murray gave Decedent a cup of water and secured him in Holding Cell Two. [Murray Incident Rep., ECF No. 38-14 at 2]. Officer Murray created an observation log and began preparing an incident report regarding Decedent's perceived detoxing. [Murray Dep. 15:9–12; Murray Incident Rep., ECF No. 38-14 at 1 (showing title of incident report as "Inmate Detoxing"); Observation Log, ECF No. 38-15 at 1]. At 3:45 a.m., Officer Murray noted on the observation log that Decedent was "laying down." [ECF No. 38-15 at 1].

Approximately ten minutes later, Officer Murray observed Decedent lying on the floor and shaking. [Murray Incident Rep., ECF No. 38-14 at 2]. Officer Murray, unsure if Decedent was pretending to have a seizure, instructed Decedent to stop shaking. Murray Dep. 21:15–22:8. When Decedent did not reply, Officer Murray set up a camera in the control room window with a clear view of Decedent inside Holding Cell Two. Murray Dep. 18:25–19:24. Officer Murray returned to the control room and continued preparing the incident report while Sergeant Montgomery monitored Decedent. Murray Dep. 19:25–20:19.

The camera began recording at 3:55 a.m. 2 [Camera Video at 00:01 (available at ECF No. 38-1)]. At 3:56 a.m., Officer Osborne opened Holding Cell One and escorted Inmate out of the cell to call his wife. [Id. at 00:02; Osborne Dep. 14:23–16:9 (available at ECF No. 38-18)]. Officer Osborne asked Officer Murray what was wrong with Decedent and Officer Murray told her Decedent was detoxing. Osborne Dep. 23:1–5. At 3:58 a.m., while Inmate spoke to his wife, Officer Osborne observed Decedent lying on the floor of Holding Cell Two, shaking in a way that resembled a seizure. Camera Video at 02:57; Osborne Dep. 21:22–22:25. From 3:55 a.m. until approximately 4:09 a.m., Decedent's arms lifted and his body seized and shook for several seconds every minute. Camera Video at 00:12–13:47. Then his arms fell back to the floor and he lay motionless until the next episode. Id.

At 4:01 a.m., Officer Osborne returned Inmate to Holding Cell One and told Officer Murray they needed to position Decedent away from the wall so he would not hit his head. Id. at 05:47; Osborne Dep. 40:20–41:10. Inmate informed Officer Osborne Decedent had vomited around the toilet in Holding Cell One. Osborne Dep. 41:22–42:8. Officer Osborne advised Officer Murray Decedent had vomited and said they needed to re-position him from his back to his side in case he vomited again to prevent him from choking. Id. 42:13–25.

At 4:03 a.m., Officer Osborne and Sergeant Montgomery opened Holding Cell Two and checked on Decedent. Camera Video at 07:58. At Sergeant Montgomery's instruction, Officer Murray pointed the camera at the floor from 4:03 a.m. to 4:04 a.m. Id. at 07:58–08:42. Neither Officer Osborne nor Sergeant Montgomery entered Holding Cell Two at that time. [SLED Add. to Osborne Rep., ECF No. 38-22 at 2 (noting GCDC's surveillance camera captured Holding Cell Two's door and "no one entered the cell at the time the body camera was pointed down at the floor")]. Sergeant Montgomery instructed Decedent to "stop faking it." Id. at 1. Sergeant Montgomery observed Decedent breathing, moving, and attempting to speak. Montgomery Dep. 66:4–22, 68:2–6.

From 4:04 a.m. to 4:05 a.m., Officer Osborne cleaned the vomit in Holding Cell One while Sergeant Montgomery spoke with Inmate, held the Holding Cell One door open, and watched Decedent. Camera Video at 08:45–09:53.

At 4:07 a.m., Officer Osborne and Sergeant Montgomery entered Holding Cell Two, moved Decedent away from the wall, and placed Decedent on his side on a mat. Osborne Dep. 44:9–16; Camera Video at 11:52–13:08. When they rolled Decedent onto his side, vomit fell from the corner of Decedent's mouth. Osborne Dep. 44:17–22. Sergeant Montgomery noted Decedent's pulse was slow and instructed Officer Osborne to obtain a cold, wet towel so he could clean Decedent's face and try to elicit a response from him. Montgomery Dep. 67:4–9.

Sergeant Montgomery and Officer Osborne continued to tend to Decedent until 4:12 a.m., when Sergeant Montgomery left Holding Cell Two to notify the shift lieutenant, who was not in the detention center, of the situation. Camera Video at 16:30; Osborne Dep. 45:8–12. Officer Osborne remained with Decedent and continued to check his pulse. Camera Video at 16:53–17:48. At 4:13 a.m., Officer Osborne indicated she could not find a pulse and did not observe Decedent's stomach rising and falling. Id. at 17:48. Officer Murray activated emergency medical services ("EMS") at 4:13 a.m. Id. at 18:14. Officer Murray told the EMS dispatcher the officers believed Decedent had taken drugs before arriving at GCDC and may be detoxing. Id. Officer Osborne continued to check Decedent's pulse, pat his face, and attempt to elicit a response. Id. at 18:14–20:14. At 4:15 a.m., Sergeant Montgomery called the shift lieutenant. [Murray Incident Rep., ECF No. 38-14 at 3]. At 4:18 a.m., EMS arrived. Id. Decedent's death certificate lists his time of death as 4:17 a.m. [Death Certificate, ECF No. 32-6 at 1].

The coroner determined Decedent died from an apparent gran mal seizure followed by cardiac arrest due to cocaine toxicity. [Autopsy Rep., ECF No. 32-4 at 3–4]. (ECF No. 45, pp. 6-10)

Coats alleges that GCDC Officers unduly delayed Cowan's access to medical care, stating that they "were in the immediate vicinity and were aware that [Cowan] was experiencing extreme physical pain, but took no action to provide or request medical care for [Cowan,] disregarding the obvious risk to his health." ECF No. 1 at 6. The Report recommends summary judgment in favor

of GCDC Officers because Coats ultimately did not demonstrate a causal connection between their actions and Cowan's death.

The undersigned undertook research to find cases that relate to delay by prison officials in seeking medical care for a prisoner. The Report focuses on one branch of deliberate indifference claims involving non-obvious, serious needs for medical care, which require verifying medical evidence of a detrimental effect "resulting from" delay. *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993) (emphasis added); *see also Formica* 739 F. App'x at 758 (deliberate indifference established where delayed treatment of over one year resulted in exacerbated condition and prolonged pain); *Webb* 281 F. App'x at 167 (no deliberate indifference where delay in performing surgery did not result in harm to inmate or worsened condition); *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (triable issue of fact as to deliberate indifference where prisoner continually reported chest pain over a three-day period and suffered a heart attack resulting in irreversible damage to her heart as a result of the delay in treatment); *Sosebee v. Murphy*, 797 F.2d 179, 183 (4th Cir. 1986) (reversal of summary judgment where guards knew that prisoner's condition had worsened and was life-threatening but they refused to seek medical care in the final ten hours of prisoner's life); *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 743 (6th Cir. 2001) (no deliberate indifference where plaintiff who suffered from kidney failure and required scheduled dialysis treatment failed to offer any medical evidence that he suffered a detrimental effect from being kept from his scheduled dialysis). To this end, the Report discusses the affidavit from Dr. Kim Collins, a board-certified forensic pathologist, who found that "[m]ost probably to a degree of reasonable medical certainty even if officers had summoned emergency assistance at or around 3:30 a.m....death was most probably not preventable due to his having ingested cocaine as shown on the autopsy and by toxicology, which was not known by those on scene." ECF No. 44-2 at 53. As

will be discussed, this Court concludes that Coats presents a cognizable claim for deliberate indifference based on the obviousness of Cowan's symptoms. However, this Court also notes that "most probably" does not meet the level of certainty required to find that no triable issue of fact exists in determining whether the officer's conduct was the proximate cause of Cowan's death.

The undersigned concludes that Coats presents a cognizable claim for deliberate indifference based on the obviousness of Cowan's seizure symptoms. As the Supreme Court has stated, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence…and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer* 511 U.S. at 843. Accepting, as required, Coats' version of the facts, Coats alleges facts that show Cowan experienced an obvious need for medical care, including his vomiting, inability to walk or stand, delirious look on his face, inability to speak, and seizures. Coats alleges that, due to the obviousness of Cowan's symptoms, GCDC Officers should have sought medical care sooner. Further, Cowan asserts they knew policy required them to do so. Although it would be difficult to know that these were symptoms of cocaine toxicity specifically, Cowan's condition presented an issue of fact as to his serious and obvious need for medical attention.

GCDC Officers argue that they did not know Cowan had swallowed a bag of cocaine and that they thought he was merely detoxing. Initially this may have been a reasonable conclusion. However, Cowan's condition became worse quickly. The GCDC Officers were certainly aware of his deteriorating condition as Cowan was crawling, he was unable to walk, he was shaking, vomiting, and had a dazed look on his face. He had what was described as a seizure and was told at that time by Sergeant Montgomery to "stop faking it." ECF No. 38-22 at 1. Sergeant

Montgomery testified about the Detention Center's policy for when an inmate is detoxing: "[i]f he's detoxing or she's detoxing, we'll isolate them, put them in a cell—a medical cell, advise lieutenant what's going on, and from there they put a watch on that person." ECF. 38 at 12. GCDC Officers did not activate emergency medical services until 4:13 AM, approximately thirty minutes after placing Cowan in an observation cell, and Sergeant Montgomery contacted his lieutenant at 4:15 AM after EMS was called. Additionally, there is no evidence in the record that any of the GCDC Officers had medical training. No one attempted to determine whether Cowan was faking the seizures, nor did officers attempt to administer CPR to Cowan when they lost his pulse. Cowan did not receive medical treatment until EMS arrived, at which point, the record reflects, he was already deceased.

In summary, the facts at issue differ from *Brown*, the case relied upon by the GCDC Officers and discussed in the Report, in a number of important ways that distinguish this case from *Brown*. In *Brown*, prison officials reacted *immediately* as soon as the inmate fell out of the shower and began seizing. Even though officials were unaware that the inmate had swallowed a bag of cocaine, the inmate's seizures were clear signs of an urgent medical need and prison officials summoned EMS immediately. Here, however, approximately forty-three minutes transpired between the time Cowan began exhibiting serious medical issues (vomiting, delirium, inability to walk or talk, and seizures) and the time GCDC Officers activated EMS. EMS arrived five (5) minutes after being notified. The facts give rise to a jury question as to whether the GCDC Officers addressed Cowan's symptoms within a reasonable time frame. Therefore, summary judgment in favor of the GCDC Officers is appropriately denied.

### IV.    Coats' Objections as to Qualified Immunity Claims

Defendants assert that they are entitled to qualified immunity for Coats' Fourteenth

Amendment claims. Under the qualified immunity defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has repeatedly stated that courts should not "define clearly established law at a high level of generality." *Mullenix v. Luna*, __ U.S. __, 136 S.Ct. 305, 308 (2015). Instead, the "dispositive question is whether the violative nature of particular conduct is clearly established." *Id.* Coats bears the burden of showing "that the right was clearly established in light of the specific context of the case, not as a broad general proposition." *Linden v. Piotrowski*, 619 F. App'x 495, 619 (6th Cir. 2015).

The question is whether at the time of the incident it was clearly established that the Fourteenth Amendment forbids prison officials who observe an inmate who is sweating and breathing heavily, vomiting, incapable of speaking, standing or walking, and having seizures from delaying approximately forty-three minutes in summoning medical care for that inmate. *See, e.g., McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) (denying qualified immunity to officer who, after noticing that the inmate was not breathing, failed to give the inmate CPR for seven minutes as he stood over the inmate in a prison cell); *Iko v. Shreve*, 535 F.3d 225, 243 (4th Cir. 2018) (denying qualified immunity to officers after inmate was pepper sprayed and collapsed in their presence and eventually asphyxiated because taking him outside for a few minutes of fresh air was an insufficient response to his serious medical needs); *Estate of Bradich v. City of Chicago*, 413 F.3d 688, 691–92 (7th Cir. 2005) (denying qualified immunity to officers who had allegedly delayed ten minutes in calling for help after discovering that a prisoner had hanged himself); *Estate of Owensby v. City of Cincinatti*, 414 F.3d 596, 603 (6th Cir. 2005) (denying qualified immunity

to officers who beat a suspect, observed him in significant physical distress, and made no attempt to summon medical care until six minutes later); *Tlamka v. Serrell*, 244 F.3d 628, 633–34 (8th Cir. 2001) (denying qualified immunity to officers who delayed ten minutes in providing CPR or any other form of assistance to an inmate they observed suffering a heart attack). Because Cowan's needs were objectively serious and obvious enough that GCDC Officers were subjectively aware of that seriousness and chose not to seek medical treatment immediately, the GCDC Officers actions, based on the caselaw set forth, put the officers on notice that his serious condition could violate Cowan's Fourteenth Amendment right to adequate medical care. The officers' assertion of qualified immunity is denied.

## V.    Coats' Objections as to State Law Claims Against Sheriff and Police Chief

Under the Eleventh Amendment, a federal court has jurisdiction to hear a claim against a state, a state's agencies, and state employees acting within their official capacity, only to the extent that either the state has expressly waived immunity or Congress has successfully abrogated that immunity. *Smith v. Ozmint*, 394 F. Supp. 2d 787, 791 (D.S.C. 2005) citing *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). South Carolina has waived its sovereign immunity to a limited degree through the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-10, *et seq.* (SCTCA). The SCTCA mandates that the "State, an agency, a political subdivision, and a governmental entity are all liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages." S.C. Code Ann. § 15-78-40. Under this waiver of immunity, the SCTCA creates the "exclusive civil remedy available for any tort committed by a governmental entity, its employees, or its agents except" for limited exceptions provided for in the act. S.C. Code Ann. § 15-78-20. The state law claims stated by Plaintiff fall

under the SCTCA.

The SCTCA waives immunity in state court for certain tort claims against the state and state employees; however, the SCTCA expressly reserves the state's Eleventh Amendment immunity in federal court. S.C. Code Ann. § 15-78-20(e) (stating "Nothing in this chapter is construed as a waiver of the state's or political subdivision's immunity from suit in federal court under the Eleventh Amendment to the Constitution of the United States nor as consent to be sued in any state court beyond the boundaries of the State of South Carolina"); *DeCecco v. Univ. of S.C.*, 918 F. Supp. 2d 471, 498 (D.S.C. 2013) (finding that the SCTCA preserves immunity for the state and state employees in federal court and therefore even if the SCTCA would allow plaintiff's gross negligence claim to proceed in state court, the SCTCA would not allow the claims to proceed in federal court).

Plaintiff alleges state law claims of negligence, gross negligence, loss of filial services[1], infliction of emotional distress, and conscious pain and suffering against Sheriff and Police Chief in their official capacities and Arresting Officers and GCDC Officers in their individual capacities.

In her Report, the Magistrate Judge found that the state law claims against Sheriff and Police Chief, in their official capacities, are barred by the Eleventh Amendment. In her objections, Plaintiff asserted that the causes of action under the SCTCA, naming Sheriff and Police Chief in their official capacities, should be construed as against the Greenwood County Sheriff's Office and the Greenwood Police Department. Because the Greenwood County Sheriff's Office and the Greenwood Police Department were on notice that they were being sued, they retained lawyers, and they participated in the litigation, the Court accepts the Plaintiff's position that these claims should be construed as against the Greenwood County Sheriff's Office and the Greenwood Police

---

[1] Plaintiff labels her cause of action "loss of filial services" but the Magistrate Judge correctly construed Plaintiff's cause of action as a claim of loss of consortium under S.C. Code Ann. § 15-75-20.

Department.

The Court finds, however, that notwithstanding the waiver of sovereign immunity found in the SCTCA, the claim against the Greenwood County Sheriff's Office is barred under the Eleventh Amendment. The Eleventh Amendment applies to a political subdivision or an arm of the State and the Greenwood County Sheriff's Office is considered an arm of the state. See *McCall v. Williams*, 52 F. Supp. 2d 611, 623, (D.S.C. 1999) ("[T]he Sheriff's Department, like the Sheriff, is an arm of the state and entitled to Eleventh Amendment immunity.") Therefore, because the SCTCA expressly reserves Eleventh Amendment immunity in federal court and the Greenwood County Sheriff's Office is immune from liability under the Eleventh Amendment, Plaintiff's state law claims against the Greenwood County Sheriff's Office are barred.

With regards to the state claims against the Greenwood Police Department, this Court declines, after consideration of the relevant factors under 28 U.S.C. § 1367(c)(3), to exercise supplemental jurisdiction over the remaining state law claims considering the Court's dismissal of the federal claims against Arresting Officers. *Shanagan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (directing district courts to consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy").

## VI. Coats' Objections as to State Law Claims Against Arresting Officers and Officer Osborne

The Magistrate Judge found that Plaintiff's state law claims of negligence, gross negligence, loss of filial services, infliction of emotional distress, and conscious pain and suffering against the Arresting Officers and Officer Osbourne in their individual capacities should be dismissed. Plaintiff objects that the Report does not consider the actions of Officer Montgomery and Officer Murray. The Report states that Plaintiff does not allege state law claims against GCDC Officers Sergeant Montgomery and Officer Murray, citing Plaintiff's

Response to Summary Judgment Motions of All Defendants which states that "the complaint does not allege state law claims against Sergeant Montgomery and Officer Murray." ECF No. 38 at 25. While the reliance on Plaintiff's statement is appropriate by the Magistrate Judge, the Plaintiff in her objections asserts she does allege state law claims against all Arresting Officers and GCDC Officers in their individual capacities. Therefore, this Court will consider the viabilities of those claims.

The SCTCA is the exclusive remedy for injury caused by state employees in the scope official duty, however it does not grant an employee personal "immunity from suit and liability if it is proved that the employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-70(b). Plaintiff does not allege Arresting Officers or GCDC Officers acted outside the scope of their official duties and therefore, the officers may only be held individually liable for Plaintiff's state law claims if Plaintiff can show that their conduct constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude.

As to the negligence and gross negligence claims, the Court agrees with the findings of the Magistrate Judge that summary judgment is appropriate because the claims lack the required elements under S.C. Code Ann. § 15-78-70(b). See *Smith v. Ozmint*, 394 F. Supp. 2d 787, 792 (D.S.C. 2005) (finding negligence claim did not include the element of "intent to harm," and thus the claim could not be asserted against state employees in their individual capacity under the South Carolina Tort Claims Act); *Barnes v. Thueme*, No. CA 5:13-2349-RMG, 2013 WL 5781711, at *1 (D.S.C. Oct. 25, 2013), aff'd, 559 F. App'x 205 (4th Cir. 2014) (finding that Plaintiff's state tort law claims of negligence and gross negligence,

amongst other claims, must be brought in state court under the SCTCA because Plaintiff's state law claims fail to allege an intent to harm or actual malice); *Gallmon v. Cooper*, No. CV 3:17-59-TLW-PJG, 2018 WL 4957406, at *7 (D.S.C. Apr. 19, 2018), report and recommendation adopted in part, rejected in part, No. 8:17-CV-0059-TLW, 2018 WL 4403389 (D.S.C. Sept. 17, 2018) (noting that while intent is an element of gross negligence, the specific element of "intent to harm" or "malicious intent" must be an element of the tort to apply personal liability on a state employee under the South Carolina Tort Claims Act and therefore Plaintiff's claim for gross negligence should be dismissed). Plaintiff objects that this conclusion overlooks S.C. Code Ann. § 15-78-60(25) which provides:

> "The governmental entity is not liable for a loss resulting from responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, except when the responsibility or duty is exercised in a grossly negligent manner."

However, this misconstrues § 15-78-60(25). Section 15-78-60 establishes exceptions to the general waiver of immunity under the SCTCA. Section 15-78-60(25) establishes that while the state waives its immunity in some regards, it preserves its immunity and "is not liable for a loss resulting from responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity," the section goes on to state a qualification to this exception "when the responsibility or duty is exercised in a grossly negligent manner." S.C. Code Ann. § 15-78-60(25). This is a separate question, however, from when an employee of a governmental entity is immune from suit. Section 15-78-60(25) does not establish that a claim

of gross negligence is sufficient in a federal action to state a claim against an employee of a governmental entity. As has been stated, under § 15-78-70, the SCTCA "constitutes the exclusive remedy for any tort committed by an employee of a governmental entity" and claims against the employee may only be brought outside the SCTCA when the "employee's conduct was not within the scope of his official duties or that it constituted actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-70.

Plaintiff's state law claim of intentional infliction of emotional distress does require a showing of actual malice and intent to harm and therefore the SCTCA does not bar state employees being held individually liable. See *Smith v. Ozmint*, 394 F. Supp. 2d 787, 792 (D.S.C. 2005) (finding that a claim of intentional infliction of emotional distress does allege and require a showing of actual malice and intent to harm and therefore the court had jurisdiction to hear the claims against South Carolina Department of Corrections officers in their individual capacities). However, as the Magistrate Judge concluded, the evidence does not support a finding of intentional infliction of emotional distress. To recover for intentional infliction of emotional distress, a plaintiff must establish that "the conduct was so 'extreme and outrageous' as to exceed 'all possible bounds of decency' and must be regarded as 'atrocious, and utterly intolerable in a civilized community.'" *Ford v. Hutson*, 276 S.E.2d 776, 778 (S.C. 1981) (quoting *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148 (Me. 1979)). The evidence does not support a finding that the conduct at issue was "so extreme and outrageous," and therefore, summary judgment is appropriate as to Plaintiff's claim of intentional infliction of emotional distress.

Plaintiff's claim of loss of consortium under S.C. Code Ann. § 15-75-20 does not show conduct that constitutes actual fraud, actual malice, intent to harm, or a crime involving moral

turpitude under S.C. Code Ann. § 15-78-70(b). Therefore, the officers may not be held individually liable under the SCTCA.

As to Plaintiff's claim of conscious pain and suffering, the SCTCA does not preclude a survival action for conscious pain and suffering, see *Boyle v. U.S.*, 948 F. Supp. 2d 577, 580 (D.S.C. 2012). However, the Magistrate Judge recommends summary judgment concluding that the evidence does not support Plaintiff's allegation that "Defendants directed a course of extreme and outrageous conduct with the intention of causing, or reckless disregard of the probability of causing, conscious pain and suffering to [Decedent]," ECF No. 1 at 10. This Court accepts the analysis in the Report. Therefore, summary judgment is granted as to Plaintiff's claim of conscious pain and suffering.

## CONCLUSION

The Court has carefully reviewed the Report and the Objections thereto in accordance with the relevant standard. Additionally, the Court has reviewed and considered significant caselaw relevant to the issues raised in the Report and the Objections. After review, the Report, ECF No. 45, is ACCEPTED IN PART AND DENIED IN PART. As to the Arresting Officers, their motion for summary judgment is GRANTED. As to Chief of Police of the City of Greenwood Gerald Brooks and Sheriff of Greenwood County Tony Davis, their motions for summary judgment are GRANTED. As to the GCDC Officers, their motions for summary judgment are GRANTED as to the state law claims and DENIED as to the Fourteenth Amendment claim.

With the dispositive motions decided, this case is ready for trial. Considering the denial of summary judgment, the parties are directed to attempt to mediate this case within forty-five (45) days. If it is not resolved, counsel shall appear for a pretrial conference on January 14, 2020, at 9:30 a.m., at which time the Court will set the date for jury selection and trial.

**IT IS SO ORDERED.**

s/ Terry L. Wooten
Terry L. Wooten
Senior United States District Judge

October 30, 2019
Columbia, South Carolina